NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4244
_____

UNITED STATES OF AMERICA

v.

JOSEPH PASSALAQUA,
Appellant

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 10-cr-667-02)
District Judge:  Honorable Faith S. Hochberg

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 4, 2012

Before:  RENDELL, CHAGARES and GARTH, *Circuit Judges*.

(Opinion Filed:  January 8, 2013)

_____

OPINION OF THE COURT
_____

RENDELL, *Circuit Judge*.

Defendant Joseph Passalaqua pled guilty to one count of conspiracy to interfere

with commerce by threat or violence in violation of 18 U.S.C. § 1951(a) for his part in

three armed robberies.  He appeals from his sentence of 190 months of imprisonment,

arguing that the District Court was substantively unreasonable in varying 55 months

above the high end of his guidelines range. In light of the nature and circumstances of Passalaqua's crimes, the underrepresentation of his criminal history, and the need to avoid disparities between Passalaqua and his co-defendants, the upward variance was reasonable, and we will affirm.

I.

Passalaqua was a 56-year-old Temple University graduate and small-business owner when he undertook a violent and bizarre crime spree in 2009. In an apparent effort to raise funds to save his failing martial arts and gymnastics school, Passalaqua began actively cultivating a reputation as a member of the mafia by hiring large men to escort him to clubs where they posed as his bodyguards and entourage. Before long, Passalaqua fell in with a group of criminals and began to live out his criminal fantasy.

Between December 2008 and September 2009, Passalaqua and a rotating group of eight co-conspirators committed nine burglaries and five armed robberies.[1] Four of these armed robberies were federally charged and Passalaqua played a substantial role by planning and serving as a getaway driver in three of them: (1) the armed robbery of Ristorante Barolo in New York City on May 11, 2009; (2) the home invasion and armed robbery of the private residence of a local pizzeria owner in Milltown, New Jersey on May 21, 2009; and (3) the armed robbery of Ritz Diner in Livingston, New Jersey on

---

[1] On December 20, 2010, Passalaqua pleaded guilty in state court to nine burglaries and one armed robbery committed during this crime spree. He was sentenced to fifteen years on the robbery charge and five years on each burglary charge, all to run concurrently to his federal sentence.

June 5, 2009.[2] In each of the robberies, Passalaqua's co-conspirators entered the residence or establishment at night wearing masks, threatened the occupants with guns, bound the occupants with zip-ties, and then used tools to pry open safes or forced victims to input combinations. The home invasion was particularly brutal because the perpetrators bound and assaulted the disabled woman they found asleep in the home and waited for her husband to return home so that they could beat him before breaking into the family's safes. Passalaqua frequented the pizzeria owned by the victims and allegedly picked their residence as a target in retaliation for a dispute over an outstanding $700 bill.

Passalaqua was arrested on September 23, 2009, and began cooperating with the government soon thereafter in anticipation of seeking a downward departure under U.S.S.G. § 5K1.1. The government arrested several of Passalaqua's co-conspirators based on the information he provided. During the investigation, the government learned that Passalaqua had failed to disclose that he and his co-conspirators robbed Ristorante Barolo. Because of this omission, Passalaqua was no longer a credible cooperator and the government had to then rebuild its case, which it did by offering a § 5K1.1 letter to one of Passalaqua's co-conspirators instead. Nevertheless, the parties entered into a "guideline plea" in which both sides agreed to stipulate to certain facts and to Passalaqua's baseline offense level of 30. The guideline plea prohibited either side from

---

[2] Passalaqua did not participate in the fourth armed robbery. Apparently angry about being excluded, he approached the victims of the robbery and offered to kill the perpetrators (his co-conspirators) for a fee. As part of the plea agreement, the government dismissed the murder-for-hire charge against him.

arguing for an upward or downward departure, adjustment, or variance from the offense level of 30. The guideline plea did not address the criminal history category and both parties reserved their rights relative to it.

Before the plea hearing, defense counsel requested a new plea agreement containing only factual stipulations and no guidelines stipulation. The "fact stip plea," which was signed on December 4, 2010, did not include a stipulation as to Passalaqua's base offense level and did not prohibit either side from arguing for a sentence outside of the guideline range.

A sentencing hearing was held on June 22, 2011, but continued to November 14, 2011, so that the Assistant United States Attorney ("AUSA") who had been involved in plea negotiations could be present. A disagreement about whether or not the government should have informed the defense counsel that it planned to seek an upward variance as a matter of professional courtesy when the defense requested the substitution of the fact stip plea for the guideline plea was a focus of both hearings. Ultimately, the issue was of little consequence as both sides agree the government was under no obligation not to seek the variance or to inform the defense of its intent to seek it. Passalaqua never asked to withdraw his plea, never alleged that the agreement was executed in bad faith, and agreed to proceed under it (all of which the District Court confirmed during the hearings).

At the hearings, the parties agreed that under the guidelines, Passalaqua's offense level was 30 and his criminal history was category II, which yields a guidelines range of 108-135 months imprisonment. Passalaqua argued for a downward variance based on his

4

cooperation. The District Court concluded that Passalaqua was not entitled to any leniency based on cooperation given his lie to the government.

The government sought an upward variance to the statutory maximum of 240 months. After hearing argument from both sides, the District Court considered the 18 U.S.C. § 3553(a) factors and concluded that the brutality of the crimes, the trauma inflicted on the victims, the need to deter such crime sprees, Passalaqua's leadership role in the conspiracy, his criminal history category that understated Passalaqua's past, and the sentences given to the other co-conspirators all weighed in favor of an upward variance. The District Court sentenced Passalaqua to 190 months.

## II.

Passalaqua claims that his sentence is substantively unreasonable because (1) the § 3553(a) factors favor leniency, not an upward variance; (2) the variance was driven by emotion and was overly punitive; and (3) the sentence results in unwarranted sentencing disparities.

The standard of review governing sentencing determinations is "abuse of discretion." *Gall v. United States*, 552 U.S. 38, 49 (2007). In reviewing a sentence imposed, this Court considers the procedural reasonableness and the substantive reasonableness of the sentence. *Id.* at 51. The "touchstone" of reasonableness is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a). *United States v. Grier*, 475 F.3d 556, 571 (3d Cir. 2007) (en banc). "Under our highly deferential standard of review of a sentencing court's decisions, we are to affirm a court's procedurally sound sentence unless no reasonable

5

sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *United States v. Siddons*, 660 F.3d 699, 708 (3d Cir. 2011) (internal quotation marks omitted).

To begin, Passalaqua argues that the District Court inappropriately fixated on the brutal nature of his crimes and did not adequately consider the other § 3553(a) factors. The record, however, does not bear this out. The District Court considered each of the § 3553(a) factors, and identified those factors that weighed in favor of leniency (i.e. his age and the unlikelihood of recidivism), other factors that were not relevant (i.e. the need for additional education), and factors that weighed in favor of a longer sentence (i.e. the brutality of the crimes, the sadistic character of the defendant, the need for deterrence, and the need to avoid disparities between the most culpable co-conspirators). Furthermore, the District Court did not fail to consider Passalaqua's arguments as the court did in *United States v. Olhovsky*, 562 F.3d 546 (3d Cir. 2009) (failing to consider mitigating evidence because of a preoccupation with revolting nature of the child pornography is reversible error), nor did the District Court merely recite the § 3553(a) factors without any meaningful consideration of their applicability like the court in *United States v. Asburn*, 502 F.3d 313 (3d Cir. 2007). Passalaqua's reliance on these cases is misplaced.

Passalaqua next attacks his sentence on the basis that the AUSA was overly emotional and vindictive, and that this tainted the District Court's reasoning. His brief quotes from portions of the second sentencing hearing in which the AUSA expressed her "personal fury" at the defendant and the "anxiety" and "nausea" she suffered as a result

6

of his lies during the investigation, and argues that the government's motion for an upward variance was retaliation for Passalaqua's lie. This argument is flawed in several respects. First, Passalauqa takes the AUSA's comments out of context—the comments were made in reference to the extended discussion about professional courtesy, and not with respect to the government's motion for an upward variance. Second, after learning that Passalaqua had lied to the government and was no longer a viable cooperator, the AUSA still offered (and Passalaqua initially accepted) a guidelines stipulation that would have prevented the government from arguing in favor of an upward variance. Indeed, it was Passalaqua who requested a fact stip plea allowing both sides to make variance arguments. Additionally, the AUSA who moved for the upward variance was not the AUSA who negotiated the pleas and expressed her personal fury at the defendant during the second sentencing hearing (that AUSA was out on maternity leave at the time the motion for an upward variance was made). Finally, the District Court expressly stated that the disagreement between counsel would not affect its sentencing decision.

Passalaqua also argues that he was singled out for an upward variance and that his sentence results in an unwarranted sentencing disparity between himself and his co-conspirators. While Passalaqua is correct that the government did not seek upward variances in the case of any of his co-conspirators, the government was bound not to because each of his co-conspirators accepted a guidelines plea that he rejected.

Passalaqua's disparity argument ultimately boils down to his contention that he is more like co-conspirators Groem (1 robbery, 75-month sentence), Lally (1 robbery, 33-month sentence), Landin (1 home invasion, 108-month sentence), Parolin (1 robbery, 79-

7

month sentence) and Prascak (1 robbery, 48-month sentence) than Danise (4 robberies, received § 5K1.1 cooperation credit, pled to 18 U.S.C. § 924(c) with 84-month mandatory minimum, 145-month sentence) and Paul (4 robberies, pled to § 924(c) with 84-month mandatory minimum, 219-month sentence). However, even defense counsel agreed that Passalaqua, Danise, and Paul formed the "upper-echelon" of the conspiracy. The District Court rejected Passalaqua's argument that Danise's and Paul's sentences should each be discounted by 84-months when comparing their sentences to his because they pled to an additional § 924(c) count. Instead, the District Court reasoned that Passalaqua was equally responsible for the brutality of the crimes and that the charging decision of the government did not affect the basic culpability of the co-conspirators or the similarity of their sentences.

III.

For the foregoing reasons, we will affirm the District Court's judgment and sentence.